UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DANIEL CASTRO,

Movant,

v.

UNITED STATES OF AMERICA,

Respondent.

Case No. 1:25-cv-849

Hon. Hala Y. Jarbou

______________________________/

**OPINION**

Before the Court is Movant Daniel Castro's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. For the reasons herein, the Court will deny the motion.

## I. BACKGROUND

Castro was a board-certified otolaryngologist who worked at Bronson Hospital in Battle Creek, Michigan. In 2022, the Government charged him with 34 counts of health care fraud for performing functional endoscopic sinus surgeries ("FESS") that were not medically necessary or for which he selected billing codes that did not apply because he did not perform the corresponding procedure, as well as 8 counts of making false statements relating to health care matters for falsely describing the procedures he performed or the nature of his patients' condition in operative reports and office notes. (*See* Indictment, *United States v. Castro*, No. 1:22-cr-16 (W.D. Mich.), ECF No. 1.) These procedures were reimbursed using Medicaid and Medicare benefits. The indictment also sought forfeiture of "at least $754,359," which represented the "gross proceeds" traceable to the charged offenses. (*Id.*, PageID.26.)

Castro initially retained attorneys Matthew Borgula and Mikayla Hamilton to represent him. He terminated that relationship in September 2022, causing his attorneys to seek leave to

withdraw. In October 2022, the Court permitted attorneys Ronald Chapman and John Cardello, Castro's newly retained counsel, to take over his representation.

**A. Plea Agreement**

Castro initially rejected a plea offer from the Government while he was represented by Borgula. (*See* Final Pretrial Conf. Tr. 4–5, *Castro*, No. 1:22-cr-16, ECF No. 296.) However, on March 16, 2023, the Court held a final pretrial conference at which it ruled on various motions in limine. At the conference, the Court held that the Government could present certain pieces of damaging evidence against Castro, including evidence that he had falsely told Michigan licensing authorities and Bronson that his hospital privileges had never been suspended or modified, when in fact an institution in California had previously suspended his clinical privileges. (*Id.* at 34–35.)

Three days later, on March 19, 2023, Castro signed a plea agreement wherein he agreed to plead guilty to one count of making a false statement to a health care insurer, in exchange for the dismissal of the other counts. By dismissing the charges for health care fraud, the plea agreement limited Castro's maximum sentence to five years instead of ten.

As the factual basis for his plea, the plea agreement stipulated that Castro had selected a "Current Procedural Terminology Code (CPT Code)" for a procedure he performed on September 20, 2016, but the code did not match the procedure he actually performed. (Plea Agreement ¶ 8, *Castro*, No. 1:22-cr-16, ECF No. 122.) Although he had performed a simple "excisional node biopsy" to remove two lymph nodes, he selected the CPT Code for a "modified radical or selective neck dissection for confirmed cancer of the head and neck," which is a more complex and higher-paying procedure. (*Id.*) As support for this code selection, his operative notes for the procedure falsely asserted that he had "dissected down to the insertion into the trapezius muscle" and that "[d]issection was continued from anteriorly to posteriorly, starting just posterior to the internal jugular vein inferiorly in the neck, in zone 5." (*Id.*) Castro "knew that the entries in his operative

note, documenting that he performed a modified radical or selective neck dissection, were materially false." (*Id.*) These notes and code selection caused the submission of a false insurance claim to the health care insurer, who paid the claim. (*Id.*) According to the plea agreement, Castro knowingly used this false statement "in connection with the delivery of or payment for health care services." (*Id.*)

As part of the agreement, Castro acknowledged that "the Government will provide factual information to the Probation Officer regarding the conduct underlying counts 1 to 34 that will be included in the Presentence Report and that he cannot object to those facts for purposes of his sentencing, including sentencing loss," though he could ask the Probation Officer to "supplement that factual information with additional facts." (*Id.*) Later in the agreement, it explained that the loss calculation for purposes of sentencing would be at least $250,000.00, that "the health care fraud schemes alleged in the Indictment . . . constitute relevant conduct for sentencing purposes," that the parties would present evidence on the total loss at a later date, and that the Court would make a final determination of the total loss. (*Id.* ¶ 14a.)

Finally, in the plea agreement, Castro agreed to waive his right to appeal or collaterally attack his conviction or sentence, subject to a few exceptions, such as an incorrect determination of the Sentencing Guidelines range by the Court or ineffective representation by counsel. (*Id.* ¶ 16.a–b.)

**B. Castro Emails Bronson**

On March 29, 2023, a little over a week after the Government filed the plea agreement with the Court, the Government informed the Court that Castro had sent an email to employees at Bronson, and that his statements in the email appeared to conflict with statements he made in his plea agreement. For instance, Castro's email stated that, "due to financial hardship, with [his] attorney's advice, [he] had to reach a settlement agreement" with the Government. (3/21/2023

Email, *Castro*, No. 1:22-cr-16, ECF No. 127-1, PageID.908.) Regarding the September 2016 surgical procedure mentioned in the plea agreement, Castro acknowledged that he only removed two lymph nodes, but he minimized his conduct, stating, "Unfortunately, I clicked the wrong CPT code on EPIC[.]" (*Id.*) He then asked Bronson to "fulfill its contractual obligations" to pay for the financial penalty that he would incur. (*Id.*) He argued that Bronson should "recognize[ ] their responsibility in this unconscionable situation," which resulted from "the lack of oversight and the perpetuation of baseless allegations by certain Bronson Healthcare employees." (*Id.*) Because of this email, the Government argued that Castro had not demonstrated acceptance of responsibility, and that it would oppose his request for a reduction in sentence due to acceptance of responsibility.

**C. Plea Hearing**

The Court held a plea hearing on April 3, 2023. At the hearing, the Court asked Castro's attorney whether Castro intended to plead guilty in light of the email he sent to his former employer. Chapman represented that Castro had "panicked" after signing the plea agreement and "wrote a very ill-advised e-mail," but that Castro still intended to plead guilty. (Plea Hr'g Tr. 3, *Castro*, No. 1:22-cr-16, ECF No. 133.)

Castro was then placed under oath. Castro affirmed that he "had the chance to discuss [the plea agreement] thoroughly" with his attorney and that he "had enough time to discuss thoroughly with [his attorney] what [his] situation is, what [his] choices are, and [his] decision to plead guilty[.]" (*Id.* at 13.) Castro affirmed that his attorney was able to answer Castro's questions "to [Castro's] satisfaction" and that Castro was "satisfied overall with the advice and the representation" he had received. (*Id.*) Castro also affirmed that he understood the rights he was waiving by entering his plea as well as the penalties for the offense to which he would be pleading guilty, and that he made his choice to plead guilty "freely and voluntarily," without threats or force from others. (*Id.* at 16–20.)

The Government then highlighted portions of the plea agreement, including Castro's agreement to cooperate with the Government, Castro's agreement to repay Medicare and Medicaid, Castro's surrender of his medical license, and the fact that the additional counts in the indictment would be considered relevant conduct for purposes of sentencing. (*Id.* at 22–24.) The Government noted that Castro had agreed that his financial obligation would be at least $250,000, but the final amount—to be determined by the Court at his sentencing—would likely be higher. (*Id.* at 22.) The Government also noted that Castro had agreed that his conduct in counts 1 through 34 of the indictment would be considered "relevant conduct" at sentencing and that he would not contest the factual basis for those counts. (*Id.* at 24.)

After the Government's presentation, Castro affirmed under oath that he had read the entire agreement, he understood all its terms, there was nothing in the agreement he did not understand or had questions about, and nothing the Government had said about it surprised him. (*Id.* at 26–27.) He also affirmed his understanding that other counts in the indictment would be used to determine the total amount of restitution he would owe. (*Id.* at 27.) And he understood that he had agreed to a "floor" in terms of restitution but that "there's going to be an argument that it's going to be a lot more than that." (*Id.*)

When asked about the factual basis for his plea, Castro testified that he "used the wrong templates"[1] and "entered the wrong CPT" code for a procedure. (*Id.* at 35.) When asked whether he did that "knowingly and willfully in falsifying that code," he agreed that he had. (*Id.* at 35–36.) The Government followed up on Castro's assertion that he "picked the wrong template." The Government asked him whether he "picked that template knowingly and willfully because it

[1] Castro's attorney explained that Bronson "used templates for certain procedures" for physicians to describe their surgical procedures in their operative notes, and that "cho[osing] the wrong template means he chose the wrong language that did not reflect the procedure." (Plea Hr'g Tr. 37.)

contained language that would suggest to the coding department of the hospital that [he] did that procedure," and Castro responded, "I picked the wrong template, yes[.]" (*Id.* at 36–37.) The Court told Castro that he had to "plead guilty because [he] want[ed] to plead guilty because [he was], in fact, guilty." (*Id.* at 37.) Castro responded, "I do plead guilty, Your Honor. I do." (*Id.*) The Court then asked him, "So . . . when you say you picked the wrong template, you picked a template that stated something that you knew was not correct." (*Id.* at 37.) Castro said, "Yes, Your Honor." (*Id.*) To drive the point home, the Government asked him, "[Y]ou did that because you wanted it to look like you did the neck dissection procedure when you knew that you didn't, right?" (*Id.* at 38.) Castro responded, "Correct." (*Id.*)

The Court further explained:

> Doctor Castro, here's why I ask the questions that I ask. I want you to fully know what you're doing. I want you to come in here, tell me what you did, because what I don't want to happen is a week later or months down the line, I don't want you coming back to me and saying you didn't understand that your plea meant certain things or that it had certain consequences or ramifications.

(*Id.*) With that explanation, the Court asked him, "You fully understand and know what you plead guilty to; is that correct?" (*Id.*) Castro said, "I do understand, Your Honor." (*Id.*) Finally, the Court asked Castro whether he had "reservations about proceeding and going forward and [the Court] accepting the plea," and he responded, "No, Your Honor." (*Id.* at 39.) The Court accepted his plea.

**D. Second Withdrawal of Counsel**

In August 2023, Castro's attorneys filed a motion to withdraw as counsel because communication with Castro had "broken down" and Castro told them that he was terminating their legal representation. (Mot. to Withdraw as Att'y ¶¶ 3–4, *Castro*, No. 1:22-cr-16, ECF No. 147.) The Court granted the motion at a hearing on August 21, 2023.

**E. Castro Asks to Withdraw His Plea**

At the same hearing, Castro indicated that he wished to withdraw his plea. The Court denied his oral motion and directed him to file one in writing. On September 8, 2023, Castro filed a pro se written motion to withdraw his guilty plea. The Court subsequently appointed attorney Parker Douglas to represent him.

After reviewing the motion, the Court denied it, concluding that Castro did not provide a sufficient explanation for his delay in filing the motion, which was based on his belief that Chapman was not adequately prepared for trial and his assertion that he felt pressured to plead guilty. The Court noted that his assertions were contradicted by his sworn testimony at his plea hearing, where he stated that (1) he discussed the case with his attorney, (2) he was satisfied with his attorney's representation, (3) his choice was made freely and voluntarily, and (4) he had no reservations about his choice to plead guilty. *United States v. Castro (Castro I)*, No. 1:22-cr-16, 2023 WL 7383256, at *5 (W.D. Mich. Nov. 8, 2023).

**F. Castro's Renewed Motion to Withdraw Plea**

Castro filed a renewed motion to withdraw his guilty plea on January 30, 2024, with the assistance of attorney Douglas. The renewed motion asserted that Chapman did not read through the plea agreement with him paragraph-by-paragraph, did not adequately explain to him the relevant conduct provisions of the plea agreement, and was not able to adequately answer Castro's questions about changing his plea. The motion was supported by an affidavit from Castro's daughter, Krystin Hamlett, who contended that Chapman did not mention the concepts "relevant conduct" or "restitution,"[2] though he did mention financial penalties of at least $250,000. *See*

[2] The phone call recordings Castro has filed indicate that Chapman did, in fact, discuss both relevant conduct and restitution with Castro.

*United States v. Castro (Castro II)*, No. 1:22-cr-16, 2024 WL 1431960, at *5 (W.D. Mich. Apr. 3, 2024).

After considering the relevant factors for withdrawing a plea, the Court denied the motion. Among other things, the Court noted that Castro's claim of innocence had vacillated over time and that his primary concern at that point appeared to be the financial consequences of pleading guilty, rather than innocence. *Id.* at *8. And he did not provide sufficient reason to disregard his sworn testimony at his plea hearing, in which he acknowledged his guilt and the terms of his plea agreement. Also, though Castro claimed that Chapman had told him that his financial penalty would be only $250,000 or less, the record before the Court demonstrated that he was aware before his plea hearing that his financial penalty could be as high as $750,000. *Id.*

Similarly, the Court was not persuaded by Castro's assertions that he pleaded guilty because he was concerned about Chapman's lack of preparedness for trial and that at the plea hearing Castro was simply following Chapman's instruction to say "yes" to the Court's questions.

> Castro clearly understood that the reason for such an instruction was to ensure that Castro could proceed with his guilty plea. If Castro did not wish to proceed, he could have said so. And if he was not satisfied with counsel's conduct, he could have said so. Castro is knowledgeable and sophisticated enough to understand the importance of telling the truth while under oath in the courtroom. He is also confident enough to terminate his hired attorneys when he is dissatisfied with them, as he did with Borgula and later with Chapman and Cardello. But here, he chose to proceed. It is not logical that he would do so while dissatisfied with counsel's assistance.

*Id.* at *9.

**G. Sentence**

Before sentencing, Castro filed many objections to his presentence report, including objections going to the medical necessity of, and the coding and billing procedures for, the surgeries he performed that were identified in the indictment, as well as objections concerning the amount of restitution he would owe. But he subsequently withdrew those objections and stipulated

to the total loss that would be used to determine his sentence under the Sentencing Guidelines ($5,091,272.03), as well as the amount of restitution that he would owe for payment of healthcare benefits ($1,950,000.00), leaving the Court to determine the restitution owed to patient victims. (Joint Stip., *Castro*, No. 1:22-cr-16, ECF No. 243.) He also stipulated that he "does not contest that he engaged in the schemes to defraud from February 2015 to May 2017 described in Counts 1 to 34 of the Indictment or that such conduct . . . is relevant conduct." (*Id.* ¶ 1a.) He agreed that "the Court should accept the plea agreement at sentencing." (*Id.* ¶ 3.) And he acknowledged that, as a result of the stipulation and the terms of his plea agreement, he was waiving his right to appeal the Court's determination of the Sentencing Guidelines range. (*Id.* ¶ 10.)

At the sentencing hearing on May 29, 2024, Castro confirmed under oath that he had read the stipulation and discussed it with his attorney, he did not have questions about it, he agreed to waive his objections to the presentence report, and he understood the loss amount that would be used for sentencing and the restitution that he would be required to pay. (Sent. Hr'g Tr. 4–7, *Castro*, No. 1:22-cr-16, ECF No. 280.) He also understood that, based on the loss amount, the Government intended to seek the statutory maximum sentence and that he was waiving his right to appeal the Guidelines range. (*Id.* at 6–7.) The Court sentenced Castro to 60 months of imprisonment followed by two years of supervised release, along with a financial penalty for restitution in the amount of $1.97 million. (J., *Castro*, No. 1:22-cr-16, ECF No. 271.)

**H. Appeal**

Castro appealed his conviction and sentence. In connection with that appeal, his counsel submitted a motion to withdraw and a brief asserting that counsel had examined the record and found no non-frivolous issues to raise on appeal, particularly in light of Castro's appeal waiver. *See United States v. Castro*, No. 24-1508, Order 1–2 (6th Cir. Jan 2, 2025). Reviewing the guilty plea de novo, and without considering any claim of ineffective assistance of counsel, the Sixth

Circuit concluded that the plea was "voluntary, knowing, and intelligent." *Id.* at 3. That court also affirmed the judgment of conviction and sentence, finding no error.

**I. Motion to Vacate**

In his amended brief in support of his motion under 2255, Castro asserts two primary claims: (1) his guilty plea was invalid because it was the product of ineffective assistance of counsel; and (2) the plea was invalid because it was not a knowing, voluntary, and intelligent act.

## II. STANDARDS

A prisoner who moves to vacate his sentence under § 2255 must show that the sentence was imposed in violation of the Constitution or laws of the United States, that the court was without jurisdiction to impose such a sentence, that the sentence was in excess of the maximum authorized by law, or that it is otherwise subject to collateral attack. 28 U.S.C. § 2255. To prevail on a § 2255 motion "a petitioner must demonstrate the existence of an error of constitutional magnitude which had a substantial and injurious effect or influence on the guilty plea or the jury's verdict." *Humphress v. United States*, 398 F.3d 855, 858 (6th Cir. 2005) (quoting *Griffin v. United States*, 330 F.3d 733, 736 (6th Cir. 2003)).

"An evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief. Thus, no hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999).

## III. ANALYSIS

**A. Relitigation Bar**

As an initial matter, the Government argues that Castro's claims are barred because he already litigated them before this Court and the Court of Appeals. Generally, a movant may not

relitigate an issue in his § 2255 motion that was addressed on direct appeal, "[a]bsent exceptional circumstances, or an intervening change in the case law." *Wright v. United States*, 182 F.3d 458, 467 (6th Cir. 1999). But here, Castro did not assert his claims regarding ineffective assistance of counsel or the invalidity of his plea on appeal. Instead, his counsel filed an *Anders*[3] brief asserting that there were no non-frivolous issues for appeal, and the Sixth Circuit made its own determination that the plea was valid. Thus, the Court is not persuaded that the relitigation bar applies here.

The Government compares this case to *Stoufflet v. United States*, 757 F.3d 1236 (11th Cir. 2014), in which the movant's appellate counsel filed an *Anders* brief asserting that there were no non-frivolous issues, yet the court of appeals determined that the movant had already litigated the voluntariness of his plea on appeal. *Id.* at 1242. In that case, however, the movant presented the issue on appeal in a pro se brief, which is not what happened here. Accordingly, *Stoufflet* is distinguishable.

Similarly, in *White v. United States*, 371 F.3d 900 (7th Cir. 2004), the movant's attorney presented the issue raised in the § 2255 motion on direct appeal. *See id.* at 902-03. By contrast, Castro's appellate attorney did not discuss ineffective assistance of counsel or the impact of counsel's representations on the knowing and voluntary nature of the plea. Instead, the brief addressed whether this Court followed Rule 11 of the Federal Rules of Criminal Procedure during the plea colloquy and concluded it did. Thus, the relitigation bar does not apply.

[3] Under *Anders v. California*, 1336 U.S. 7133, 744 (1967), appellate counsel seeking leave to withdraw must point out issues that might arguably support the appeal.

**B. Ineffective Assistance**

Castro argues that his guilty plea is invalid because it was the product of ineffective assistance of counsel. A claim of ineffective assistance of counsel has two parts. First, Castro must show that his counsel's performance "fell below an objective standard of reasonableness . . . under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "Because of the difficulties inherent in making [that] evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Second, Castro must show that counsel's performance prejudiced him. *Id.* at 692. In the context of a guilty plea, the prejudice standard requires Castro to show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). This inquiry sometimes "resemble[s]" the inquiry courts conduct when assessing prejudice in the context of challenges to a conviction after a trial. *Id.* For instance, if the claim is that the defendant pleaded guilty because counsel failed to investigate or discover exculpatory evidence, then the prejudice inquiry will depend in part on whether a defense relying on that evidence likely would have succeeded at trial. *Id.*

In addition, "[t]he Due Process Clause prohibits defendants from pleading guilty—and from waiving their constitutional rights—unless they do so in a 'knowing and voluntary' manner." *United States v. Ellis*, 115 F.4th 497, 501 (6th Cir. 2024) (quoting *Parke v. Raley*, 506 U.S. 20, 28–29 (1992)). "Federal Rule of Criminal Procedure 11 seeks to guarantee knowing-and-voluntary pleas by requiring district courts to hold plea hearings" at which the Court ensures that "defendants understand the nature of their crimes and the rights they will waive by pleading guilty." *Id.* "Once a district court satisfies this duty, though, a defendant's admissions at the plea hearing serve as a 'formidable barrier' to later claims that the defendant misunderstood something

about the plea." *Id.* (quoting *United States v. Day*, 2022 WL 17547518, at *2 (6th Cir. Dec. 9, 2022)). "[A] 'yes' answer generally suffices to show that a defendant acted in a knowing and voluntary way." *Id.* at 502. "[A] defendant must be bound to the answers he provides during a plea colloquy." *Ramos v. Rogers*, 170 F.3d 560, 566 (6th Cir. 1999).

Castro objects to several aspects of the advice he received. The Court will address each in turn.

**1. Dismissing Castro's Defenses**

Castro argues that Chapman disregarded Castro's strongest defenses, giving him the false impression that he had no viable path to acquittal. For instance, Castro contends that the evidence shows that Bronson's billing coders had the final word over what code to apply to his procedures, which would have undermined the Government's theory that Castro manipulated those codes and was responsible for the false codes that were submitted to the insurers for payment. In support, he points to an FBI report of an interview of Carla Herbert, the Director of Practice Operations at Bronson. (Herbert Interview Rep., ECF No. 16-1.) According to the report, Herbert stated that Bronson's *physicians* were required to enter the appropriate billing code for their procedures. (*Id.* at 3.) When Castro would complete that portion of the billing process, he would submit it to the "biller/coder," who would "review the OP Notes to determine if it supports the selected billing code." (*Id.*) In some cases, the biller/coder would make changes to the codes Castro submitted. (*See* 9/13/2021 Email, ECF No. 16-11.) However, Herbert clarified that the biller/coders would rely "solely on the OP Notes to review the physician's billing statements to determine if the selected billing code was appropriate." (Herbert Interview Rep. 5.) And here, as Castro acknowledged in his plea agreement, he selected the wrong billing code *and* he falsified his operative notes to support the billing code he submitted. The Government made this same point at the plea hearing, explaining:

> [T]he government at trial would show that the defendant performed a procedure on a patient PR. The patient had been complaining of swelling in the left side of her neck; that the defendant decided to do a procedure to remove the lymph nodes that were in her neck, two lymph nodes. That he, in fact, did an excisional lymph node biopsy, was the surgery actually performed. Within about 10 minutes of completing that procedure the defendant prepared an operative report to document what he, in fact, did. The operative report does not refer to an excisional lymph node biopsy either in the description of the procedure he performed on the first page of the operative report or within the body of the report itself. Instead, the defendant said that he performed a left modified radical neck dissection. . . .
>
> So, what occurred is the defendant falsified his operative report by saying that he performed a neck dissection in particular zones of the neck when, in fact, he did not.

(Plea Hr'g Tr. 29–30.) And at that hearing, Castro expressly acknowledged under oath that he "entered the wrong CPT code" *and* that he "used the wrong templates"[4] to document the procedure he performed. (*Id.* at 35.) He also testified that he picked the template knowing that it was not correct, in order to make it look like he performed a procedure he did not perform. (*Id.* at 37–38.) Similarly, before the plea hearing, Castro told Chapman over the phone that he "was wrong with the code" *and* that his operative notes were "inaccurate," all of which cuts against his assertion that Bronson's employees were responsible for the false billing codes. (3/27/2023 Call 3 Tr., ECF No. 6-28, PageID.227.)

As to other counts in the indictment (which were considered relevant conduct for purposes of sentencing), the Government represented that it would present evidence at trial that Castro "routinely did sinus surgeries that were not medically necessary" and that he "falsified his office notes to make it appear as if [his patients] were suffering from sinus related conditions." (*Id.* at 31.) As support for the lack of medical necessity, the Government asserted that Castro

> obtained CT scans that most of the time he didn't even review, and when he did review them, they did not show disease that justified performing sinus surgery, and to the extent they showed anything at all, instead of limiting his surgery to that area,

[4] As indicated above, Castro used templated language in his operative notes to describe the procedures he performed.

> he did surgery routinely on all of the sinuses, all eight sinuses on both sides of the patients, and then he billed for all of those procedures.

(*Id.*) This evidence also undercuts Castro's attempt to shift blame to Bronson's staff.

Castro does not discuss his admissions or any of this other evidence in his motion. And in any case, even if other employees were responsible for reviewing his billing codes, that review would not excuse him from selecting the wrong ones. In short, the evidence Castro has presented does not in any way diminish his responsibility for his false statements. Consequently, it was not unreasonable for counsel to disregard this defense. Indeed, when discussing this issue with Castro, Chapman correctly stated, "The fact that billers and coders review evidence does not absolve you from the requirement to properly enter in records." (3/27/2023 Call 1 Tr., ECF No. 6-24, PageID.220.) Chapman did not provide ineffective assistance with regard to this defense.

Castro also claims that his attorney disregarded other possible defenses, such as "patient-initiated surgery requests" and "DOJ emails confirming [Blue Cross Blue Shield (BCBS)] had no standards for sinus surgery necessity." (Am. Br. in Supp. of § 2255 Mot., ECF No. 2, PageID.74.) Castro offers no evidence of the former, and in any case, it is not clear why a surgeon would perform, or an insurer would reimburse, a medically unnecessary sinus surgery simply because the patient requested it.

As to BCBS's lack of standards, Castro offers an email indicating that BCBS does "not have a specific policy on all procedures" but that it "follow[s] CMS guidelines" for sinus surgery CPT codes. (Email, ECF No. 16-14, PageID.445.) He does not explain how the absence of a specific policy would have helped him defend against the charges, especially if BCBS followed standard guidelines from CMS.

Moreover, even in the absence of a policy, there was significant evidence indicating that Castro had performed unnecessary surgeries. Before sentencing, the Government submitted

statements from victims who reported that they were referred to Castro for issues unrelated to their sinuses, but he fabricated information in their patient records about sinus problems, and he never told them that he would be operating on or altering their sinuses as part of his surgery.[5] (*See* Victim Impact Statements, *Castro*, No. 1:22-cr-16, ECF No. 239-1.) In addition, the FBI interviewed at least one of the victim's primary care physicians, who reported that his patient had no history of sinus problems before seeing Castro; instead, her primary complaint was a fractured nose, yet Castro falsely documented that she had a history of chronic sinusitis and snoring and was currently taking antibiotics. (Chang Interview Rep., *Castro*, No. 1:22-cr-16, ECF No. 239-3.) Castro then performed surgery on all her sinus cavities, despite the fact that her only problem requiring surgery was a deviated septum. (*Id.*)

Regardless of whether BCBS had a specific policy regarding the medical necessity for sinus procedures, the foregoing facts amply support the lack of medical necessity for procedures performed by Castro. Accordingly, the Court is not persuaded that counsel was ineffective for disregarding evidence about BCBS's lack of a specific policy for sinus procedures.

**2. Advice About Relevant Conduct**

Castro argues that Chapman gave him erroneous advice about stipulating that other counts in the indictment could be used as relevant conduct in determining his sentence. Before the plea hearing, when Chapman was explaining to Castro that the Government would be able to consider the unnecessary sinus surgeries as relevant conduct, Castro stated, "I hope you understand that I don't agree with anything, and it's not the truth. I'll say all of that." (3/27/2023 Call 5 Tr., ECF No. 6-32, PageID.240.) Chapman responded, "Agreeing that they can be used as relevant conduct

---

[5] Chapman referenced these victim statements in his pre-plea discussions with Castro, saying, "[T]he patients will testify and they're all going to say it wasn't medically necessary." (3/16/2023 Call Tr., ECF No. 6-16, PageID.190.)

doesn't mean that you're admitting that they were unnecessary." (*Id.*) Castro contends that this advice was incorrect, and that it prejudiced him by encouraging him to plead guilty instead of going to trial. But Castro does not explain why this advice was incorrect. Agreeing that these surgeries could be used to determine Castro's sentencing guidelines was not the same as affirmatively admitting that the surgeries were unnecessary. Chapman had just explained to Castro that

> for the relevant conduct guidelines side, we are not contesting that those [unnecessary surgeries] can be used. That doesn't mean that you're guilty of them. . . . That doesn't mean you're admitting that you did them. You were just saying, 'Judge, if you want to consider those as relevant conduct, I will not contest that. You can consider that as relevant conduct. You can consider that when you're figuring out what my guidelines should be.' That's it.

(3/27/2023 Call 4 Tr., ECF No. 6-30, PageID.236.)

Part of Castro's concern was that his plea would impact his liability in civil lawsuits that were still pending against him. (*See* 3/19/2023 Call 1 Tr., PageID.200.) But Chapman properly explained that Castro was not admitting the facts underlying the other surgeries that formed the basis for the other counts in the indictment, and that while his conviction on the one count for making a false statement "is maybe something that could cut against [him]" in the civil lawsuits, he could still "maintain [his] innocence" regarding the other surgeries. (*Id.*)

Importantly, Chapman explained the legal significance of agreeing that the purportedly unnecessary sinus surgeries could be used as relevant conduct, as opposed to admitting that they were unnecessary. Castro would not be pleading guilty to those incidents as additional fraud offenses, but the Court would be able to use them to set the recommended range of sentence within the statutory maximum of five years of imprisonment. (3/27/2023 Call 4 Tr., PageID.234.) In other words, the "dollar amounts from the sinus surgeries" would be "used to factor into the

sentence."[6] (*Id.*) On the other hand, if Castro decided to go to trial and was convicted on "even one count" of health care fraud for conducting an unnecessary sinus surgery, then all the other sinus surgeries would be relevant conduct, but his statutory maximum sentence would be ten years instead of five.[7] (*Id.*, PageID.236.) That advice was reasonable.

In addition, Castro has not shown prejudice. At Castro's plea hearing, the Government explained that, according to the plea agreement,

> [t]he conduct in in [the dismissed counts] is relevant conduct, which as part of the factual basis of his plea agreement he has agreed he will not contest at the time of sentencing. Effectively meaning that for purposes of the sentencing process, the government has proved that he has engaged in medically unnecessary sinus surgeries and that he has done the other frauds alleged in those counts which includes up-coding and billing for services not rendered related to both sinus surgeries and neck dissections.

(Plea Hr'g Tr. 24.) After this explanation, Castro told the Court that he had read the whole agreement, he understood it, nothing the Government had said surprised him, and he had no questions about it. (*Id.* at 26–27.) In other words, he understood the legal impact of the relevant conduct provisions in his plea agreement when deciding to proceed with his guilty plea. Thus, he has not shown that, but for his counsel's allegedly bad advice, he would not have pleaded guilty. *See United States v. Pola*, 703 F. App'x 414, 423 (6th Cir. 2017) ("When an ineffective-assistance claim is based on misleading information regarding the consequences of a plea, a proper plea colloquy is generally deemed to cure any misunderstanding the defendant may have had about the consequences of the plea.").

[6] Under § 2B1.1 of the Sentencing Guidelines, the offense level for Castro's offense increases according to the dollar amount of "loss" (i.e., pecuniary harm) resulting from the offense.

[7] For the unnecessary surgeries, the Government charged Castro with health care fraud under 18 U.S.C. § 1347. The statutory maximum for that offense is ten years. *See id.*

**3. Coached Narrative**

Castro argues that Chapman provided ineffective assistance by coaching Castro and telling him what to say at the plea hearing. Specifically, after Chapman explained that Castro would be "pleading guilty to a false statement, not just mistakenly clicking the code," Castro asserted, "The honest truth is it was a mistake. I said, I am the one who clicked on it. That's a mistake I made." (3/27/2023 Call 1 Tr., PageID.219.) Chapman responded, "I know that's not what happened. We have entries, medical notes suggesting that was the procedure [that was performed]. . . . You just need to say I put in a false code. That's what happened." (*Id.*, PageID.220.) Castro then acknowledged that he "would have to say that [he] intended to put that false statement to mislead the Medicare." (*Id.*) Chapman replied,

> You read the elements. You read the agreement. You intended to put a false statement and there was a false statement in there. That's what's required. We talked about that. Many times you started to say it was a mistake. [Castro's daughter] Krysten even corrected you and said, "No, dad, it's a false entry." . . .
>
> . . . I'm just saying you're going to have to stand up in front of that court and say, "I put a false entry into a medical record. I put a false entry into the coding system, and as a result, Medicare reimbursed a higher amount." That's it. That's not that hard. Then you get this deal and then we move on with our lives. I know it was not just a mistake. I know that's the defense.

(*Id.*)

Castro then referenced "all the evidence that every code was thoroughly checked by the coding billing system," but as discussed above, Chapman properly explained why that evidence would not help Castro's case:

> You need to stop with this. That doesn't matter. I told you over the phone, we had this exact conversation. The fact that billers and coders review evidence does not absolve you from the requirement to properly enter in records.

(*Id.*)

Castro argues that it was improper for his attorney to feed him a "pre-packaged confession" and coach him on what to say. On the contrary, Chapman's advice was reasonable. He properly explained the specific facts Castro would have to admit in order to proceed with his plea and obtain the benefit of the plea agreement. In short, Chapman made clear that Castro would have to admit he made a false statement and that what he did was not a mistake; otherwise, the Court would not accept the plea. The Court made the same thing clear to Castro at the plea hearing, after which Castro affirmed under oath that his actions were not a mistake. Though Castro told Chapman he believed his conduct was a mistake, Castro made clear to the Court that his conduct was *not* a mistake. And as this Court previously indicated:

> Castro clearly understood that the reason for [Chapman's instructions] was to ensure that Castro could proceed with his guilty plea. If Castro did not wish to proceed, he could have said so. And if he was not satisfied with counsel's conduct, he could have said so. Castro is knowledgeable and sophisticated enough to understand the importance of telling the truth while under oath in the courtroom. He is also confident enough to terminate his hired attorneys when he is dissatisfied with them, as he did with Borgula and later with Chapman and Cardello. But here, he chose to proceed.

*Castro II*, 2024 WL 1431960, at *9.

Chapman also reasonably explained why Castro's mistake defense was unpersuasive, i.e., Castro not only selected the wrong CPT code on multiple occasions, he also selected the wrong templated language for his operative notes to support those code selections; thus, it did not matter whether hospital staff also reviewed his code decisions because they relied on his notes to evaluate the codes. In short, Chapman's advice was reasonable.

**4. Financial and Reputational Consequences**

Castro contends that counsel's advice was prejudicial because it ignored the financial and reputational consequences of pleading guilty and focused narrowly on the risk of incarceration. There is no question that pleading guilty without sufficient knowledge of the relevant

consequences of that plea could suffice to establish prejudice. But Castro does not contend that he was unaware of the financial or reputational consequences. To the contrary, as the Court discussed when denying one of Castro's motions to withdraw his guilty plea, the record demonstrated that Castro "understood . . . the financial consequences of his guilty plea." *Castro II*, 2024 WL 1431960, at *9. He does not claim otherwise. And it was not unreasonable for counsel to focus primarily on the risk of incarceration. Indeed, incarceration alone has somewhat obvious and significant financial and reputational consequences. In the end, it was Chapman's responsibility to inform Castro of the risks and potential consequences of his decision, which is what Chapman did. But it was up to Castro to weigh those risks and consequences. Thus, Castro has not established unreasonable conduct or prejudice.

**C. Invalid Plea**

Castro also contends that his guilty plea was invalid because it was not a knowing, voluntary, and intelligent act. Castro argues that his plea was a "capitulation to circumstances," including counsel's "coercive conduct," rather than a voluntary admission of guilt. (Am. Br. in Supp. of § 2255 Mot., PageID.79.) This argument is not supported.

Castro apparently contends that Chapman coerced him by "exploit[ing] Dr. Castro's vulnerabilities and downplay[ing] the plea's consequences." (*Id.*, PageID.57.) In particular, he refers to Chapman's statements that Chapman thought Castro faced a risk of conviction at trial for commission of health care fraud, which carried a maximum sentence of ten years as opposed to five years, and Chapman did not "want to see [Castro] go to jail for the rest of his natural life." (3/16/2023 Call Tr., PageID.188.) Chapman said he would not recommend a plea agreement if "[he] thought that [Castro] should spend time in jail." (3/19/2023 Call 2 Tr., ECF No. 6-20, PageID.208.) And initially, Chapman gave his opinion that he thought "there is a universe in which I can convince a judge that you should not spend one day in jail. Your age, your health, the

fact that you're pleading to a false statement charge, which is not a serious charge." (*Id.*, PageID.209.) He opined that "the best path that we can . . . that keeps you out of jail is the plea path." (*Id.*, PageID.208.) At the same time, however, Chapman did not promise that Castro would not face prison time by pleading guilty, because "we're dealing with a judge that could make any decision on that day that she feels is necessary." (*Id.*, PageID.208.) And in a subsequent call, Chapman explained that the Court would determine the sentence "based on the guidelines" and Castro's personal characteristics and history, with a statutory maximum of five years. (3/27/2023 Call 4 Tr., PageID.236.) Chapman also represented that the "best scenario is zero jail time" but the "worst scenario is five years." (*Id.*)

Chapman's statements do not amount to coercion. Presenting an assessment of the risks of going to trial compared to pleading guilty is what counsel should do, and in light of Castro's age, going to prison for an extended period (particularly if that period was longer than five years) would potentially mean that Castro would be incarcerated for the rest of his natural life. Those statements were informative, not coercive. Moreover, as indicated above, Castro himself testified under oath that he was not "forced or threatened" to plead guilty, that he had not been made any promises to induce him to plead guilty that were not contained in the plea agreement, that his choice to plead was made "freely and voluntarily," that he agreed with all aspects of the plea agreement, that he had no reservations about pleading guilty, and that he was satisfied with the advice and representation his counsel had given him. (Plea Hr'g Tr. 13, 20–21, 28, 39.) These assertions under oath undermine his present claim that he felt coerced into pleading guilty. *See Leedy v. United States*, No. 23-3701, 2024 WL 5440315, at *4 (6th Cir. Apr. 15, 2024) ("Leedy's claim that he signed the plea agreement under threat from counsel is undermined by his sworn

statements at the change-of-plea hearing that his plea was voluntary and not the result of any threats or force, and that he was satisfied with counsel's advice.").

Castro also contends that Chapman falsely advised him that he was not pleading guilty to a crime that required fraudulent intent. According to Castro, the plea agreement "explicitly required him to admit that he acted with the 'intent to defraud'" and required "an admission of fraudulent intent." (Am. Br. in Supp. of § 2255 Mot., PageID.58.) The plea agreement does not contain that language, however. Instead, it states that the Government was required to prove that Castro "falsified, concealed, or covered up by any trick, scheme, or device a material fact or made or used any false writing or document, knowing the same to contain a materially false, fictitious, or fraudulent statement or entry," and that Castro "acted knowingly and willfully." (Plea Agreement ¶ 2.) In Castro's case, he created a "materially false operative report" and selected a CPT code for a "procedure he did not actually perform." (*Id.* ¶ 8.) Accordingly, "he made or used a materially false document, knowing that document to contain a materially false statement, in a matter involving a health care benefit program in connection with the delivery of or payment for health care services." (*Id.*) Contrary to Castro's assertion, the plea agreement does not assert that Castro acted with fraudulent intent or an intent to defraud. Thus, this argument is meritless. Accordingly, Castro has not shown that his plea is invalid.

## IV. CONCLUSION

In summary, Castro's arguments are meritless. He has not shown that he is entitled to relief. In addition, he has not shown that he is entitled to an evidentiary hearing. The facts at issue are not disputed. The record conclusively establishes that his claims are meritless. Consequently, the Court will deny his motion without conducting a hearing.

An order and judgment will enter consistent with this Opinion.

Dated: October 13, 2026

/s/ Hala Y. Jarbou
HALA Y. JARBOU
CHIEF UNITED STATES DISTRICT JUDGE